**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

THE BIDWELL FAMILY CORP., *et al.*,    :
                                       :
    *Plaintiffs*,                    :    Case No. 1:19-cv-201
                                       :
v.                                     :    Judge Jeffery P. Hopkins
                                       :
SHAPE CORP., *et al.*,                 :
                                       :
    *Defendants*.                    :
                                       :

---

**OPINION AND ORDER**

---

Plaintiffs in this case are members of the Bidwell family and their family corporation, specifically: Arthur W. Bidwell, Jr., Martin J. Bidwell, Joseph M. Bidwell, Kathleen E. Bidwell Gramke, Marianne Bidwell Walter, Father Michael L. Bidwell, and the Bidwell Family Corporation, formerly known as Magnode Products, Inc. (hereinafter referred to collectively as "the Bidwells"). Defendants are the Shape Corporation and the company they purchased from the Bidwells, which they renamed Magnode, LLC (hereinafter referred to collectively as "Shape").

In this action, the Bidwells seek the unpaid balance of $20 million they claim is owed them from an Asset Purchase Agreement (the "APA") they entered for selling their family business to Shape for a total of $76.5 million; Shape has already paid the Bidwells $56.5 million of the funds due under the APA and there is no dispute regarding payment of those funds. As its counsel conceded at a November 22, 2024 hearing, Shape is also not seeking to rescind the APA. The matter is currently before the Court on the Bidwells' Motion for Summary Judgment (Doc. 113) (the "Motion") and the Bidwells' request that this Court order Shape to immediately pay them the remaining $20 million due under the APA based on a

breach of contract claim asserted in the Amended Complaint (Doc. 32), and a request that the Court reject Shape's contention that it is authorized to set off against those funds (*i.e.*, the unpaid $20 million under the APA) based on its own claims for breach of contract and fraudulent inducement asserted against the Bidwells in the Answer to the Amended Complaint and Counterclaim (Doc. 34). Shape's Response to the Motion (Doc. 121) and the Bidwells' Reply (Doc. 124) are also before the Court and have been duly considered.

The Bidwells contend there is no genuine issue of material fact regarding their entitlement to all of the money promised them under the APA and its amendments and to an order rejecting Shape's breach of contract and fraudulent inducement claims seeking a set off against those funds (specifically the unpaid $20 million of the $76.5 million contracted for under the APA). Doc. 113-1, PageID 13891–92.

For the reasons stated below, the Bidwells' Motion (Doc. 113) for Summary Judgment on their breach of contract claim is **GRANTED**; the Bidwells' Motion for Summary Judgment as to Shape's counterclaims is also **GRANTED**.

## I. FACTUAL BACKGROUND

### A. Magnode: A Brief History

The Bidwells' story in many respects portrays a real-life dramatization of the promise America holds for individuals—in this case a family of individuals—who display more than a modicum of ingenuity and hard work, assumption of risk to start up a novel business, the foresight to relocate that business across the country to take advantage of emerging markets and opportunities, and perseverance through decades of up and down business cycles—all while creating new jobs, helping communities thrive economically, and achieving financial success for their employees, business partners, and themselves. The patriarch of the family,

Arthur W. Bidwell, founded a company called Magnode Products, Inc. ("Magnode") in New York in 1947. Doc. 32, PageID 921. The company initially produced magnesium anodes—metal rods used in water heaters that protect hot water tanks from corrosion—and other metal extrusion products. *Id.* (Metal extrusion is a process in which metal is pushed through a die to create a piece of metal in a particular shape). Mr. Bidwell's son, Arthur W. Bidwell, Jr., took over management of the company after his father's death. *Id.* Arthur Bidwell Jr. saw an opportunity for Magnode's metal extrusion business in the expanding interstate highway system, which required large amounts of extruded metal for guardrails. *Id.* To capitalize on this opportunity, Mr. Bidwell moved Magnode to Trenton, Ohio, near the intersection of Interstates 70 and 75. *Id.* at PageID 922.

Over time, Magnode came to focus exclusively on aluminum extrusion. And in 1969, it installed a 4,500-ton press designed to extrude aluminum guard rails. Then, in 1978 the company expanded its operations into Indiana after acquiring Indianapolis-based Wright Manufacturing. *Id.* Operating out of Indianapolis and Trenton, Ohio for the next 35 years, Magnode developed a reputation for high-quality aluminum extrusion. *Id.*

In the mid-2010s, Magnode developed a new business plan that called for the installation of a new 3,300 ton aluminum extrusion press made by Japanese manufacturer Ube Machinery Corporation, Ltd. (the "Ube Press.") *Id.* Under the plan, the Ube Press was to be installed at Magnode's Trenton, Ohio facility and the Indianapolis facility would be shut down. *Id.* at PageID 923.

### B. The Asset Purchase Agreement

Shape Corporation is an automotive and industrial parts supplier based in Grand Haven, Michigan. Doc. 33, PageID 1283. Shape is a tier-one automotive supplier, *id.* at

3

PageID 1285, meaning that it supplies parts directly to automobile manufacturers. Shape operates 14 manufacturing facilities in North America, Europe, and Asia, and is a market leader in manufacturing bumpers. Doc. 32, PageID 923. However, as Shape's counsel conceded during the November 22, 2024 hearing—and which will become evident from the discussion that follows—Shape was inexperienced in negotiating acquisition agreements, and the purchase of Magnode was its first purchase of another business.

In 2016, Shape approached Magnode indirectly about a possible purchase agreement. Doc. 32, PageID 922. Magnode informed Shape that it was in the process of implementing a new business plan that involved installation of the Ube Press at Magnode's Trenton, Ohio facility and shutting down operations in Indianapolis. *Id.* at 922–23. In December 2016, Magnode and Shape entered into a Memorandum of Understanding and Non-Disclosure Agreement to allow Shape to conduct due diligence on Magnode. *Id.* at 924. On June 22, 2017, Magnode and Shape entered into a Letter of Intent, after which Shape continued to conduct due diligence, and the parties continued to negotiate the terms of a possible agreement.

On February 23, 2018, the parties entered into a definitive APA under which Shape agreed to purchase Magnode. *Id.* at PageID 925. The parties closed on the transaction on March 5, 2018. Doc. 113-1, PageID 13889. Under the APA, Shape agreed to pay $56.5 million in cash or assumed debt obligations at closing. Doc. 32, PageID 925. Shape further agreed to pay $10 million approximately a year later, on March 31, 2019, and to pay an additional $10 million in 2020 if Magnode achieved an agreed earnings target in the 2019 calendar year. *Id.*

4

### C. Closing Contingencies Under the APA and Indemnification

There were closing contingencies in the APA related to the installation of the Ube Press and transfer of activities from Indianapolis to Trenton. *Id.* The agreement required the installation of the Ube Press to be complete, as well as construction of the facility in Trenton that was to house the Ube Press. *Id.* It also required termination of all business operations at the Indianapolis facility. *Id.*

Additionally, the Asset Purchase Agreement provided limited opportunities for Shape to avoid making the guaranteed deferred payments called for by the APA. Primarily, the APA contained a limited "Right of Set-Off," giving Shape the right to withhold from its deferred payment obligation amounts for which Shape was entitled to be indemnified:

> (g) **Right of Set-off.** Buyer shall have the right to withhold and set off, without duplication, against any amount otherwise due to be paid as the Deferred Purchase Price or pursuant to this Section 2.07 the amount of any Post-Closing Adjustment or any Losses to which any Buyer Indemnified Party may be entitled under ARTICLE IX of this Agreement, subject to the limitations set forth in ARTICLE IX. In no event, however, shall any right of set-off attributable to Losses under Section 9.02(a) exceed $780,000, except in case of Fraud.

Asset Purchase Agreement § 2.07(g), Doc. 32-1, PageID 970.

Article IX of the APA, in turn, gave Shape the right to indemnification for certain narrow categories of post-closing expenses. The APA provided that, subject to limitations, Shape would be indemnified for three categories of expenses:

> (a) [A]ny inaccuracy in or breach of any representations or warranties of [Magnode] or [the Bidwells] contained in this Agreement;
>
> (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by [Magnode] or [the Bidwells] pursuant to this Agreement; or
>
> (c) any Excluded Asset, any Excluded Liability or Cost Over Runs.

*Id.* § 9.02 at PageID 1011–12.

5

Most relevant to the instant dispute is the term Cost Over Runs, defined in the APA to include, as relevant here, any expenses incurred by Shape after closing with respect to the 2018 Expansion Project in excess of $10,997,000. *Id.* Article I, Doc. 32-1, PageID 947–48. The 2018 Expansion Project was defined as follows:

> "2018 Expansion Project" means the acquisition and installation of a new 3300 Ton UBE Press and related equipment, including land, building, leasehold improvements, machinery and equipment, support equipment, permits and other miscellaneous items as more particularly described on Exhibit E hereto.

*Id.* at PageID 959.

Exhibit E is a chart titled "Certain Closing 2018 Expansion Project Amount Expenditures" identifying several expenses related to the 2018 expansion project, totaling $10,997,000 and setting out a monthly payment schedule for these expenses, running from December 2016 until February 2018. Unredacted APA Exhibit E, M. White Rule 30(b)(6) Dep. Ex. 2, Doc. 108-2, PageID 12258.

The APA also designated Martin Bidwell and Joseph Bidwell as Key Employees, and they entered into employment agreements to work for Shape-owned Magnode after closing. Doc. 32, PageID 926. Kathleen Bidwell Gramke also continued working at Magnode immediately after closing. *Id.*

### D. The Post-Closing Amendments to the APA

The Bidwells' subsequent experience proves the wisdom of the adage, "A bird in the hand is worth two in the bush." In May of 2018, the Bidwells' relationship with Shape soured in connection with concerns over cash flow at Magnode. *See id.* at PageID 927; Shape Response to Proposed Undisputed Facts, Doc. 121-1, PageID 14630. On May 15, 2018, the parties amended the APA. Doc. 121-1, PageID 14630. The May 15 Amendment terminated Martin Bidwell and Joseph Bidwell's employment with Magnode. Doc. 32-2, PageID 1248–

50. The May 2018 amendments under the APA also replaced Shape's deferred payment obligations—the $10 million 2019 payment and the $10 million earnout—with four guaranteed annual payments of $5 million each, beginning on March 31, 2019. *Id.* at PageID 1248–50. The agreement further provided: "Consistent with Section 2.07(g) of the APA, the payments to be made pursuant to this letter will be subject to set off for any Losses for which [Shape] may be entitled to indemnification." *Id.*

The parties again amended the APA by letter agreement on June 7, 2018. Doc. 32-2, PageID 1248. The parties resolved certain items left open in the APA, agreeing there would be no post-closing adjustment to the purchase price, and removing certain obligations related to the tax consequences of the deal. *Id.* at PageID 1251. Shape also waived its right to claim interest or financing charges related to four specified capital leases as Cost Over Runs. *Id.* Shape expressly preserved its right to indemnification for other Cost Over Runs. *Id.*

The final amendment, dated June 14, 2018, confirmed that Martin and Joseph Bidwell had resigned from Magnode as was contemplated by the May 15 agreement. *Id.* at PageID 1254. The June 14, 2018 final amendment further confirmed that the changes made in the May 15 Agreement to the structure of the deferred payments were in effect, subject to the June 7 Agreement. *Id.*

### E. The Indemnification Notice

On November 27, 2018, Shape sent the Bidwells a Notice of Indemnification. Doc. 32-3, PageID 1256. In the Notice, Shape claimed $4.79 million in Cost Over Runs indemnifiable under § 9.02(c) of the APA. *Id.* at PageID 1257. Of this amount, $3.8 million was attributed to a contract with Duke Energy that Shape claimed was associated with the 2018 Expansion Project, $118,755 was attributed to repairs to storm drains Shape claimed

7

were associated with the Project, and $1.2 million was attributed to paving it claimed was associated with the Project. *Id.* at PageID 1256–57.

Under § 9.02(b) of the APA Shape further claimed $2.37 million for losses from the Bidwells' alleged breach of their promises to conduct Magnode's business according to commercially reasonable standards and preserve its existing business relationships. *Id.* at 1257–58.

Finally, under § 9.02(c) of the APA, Shape claimed approximately $300,000 for expenses it expected to incur for asbestos abatement, fixing equipment that had discharged coolant into storm drains, and investigation of an underground storage tank. *Id.* at 1258–59.

The Bidwells' then-counsel responded on December 21, 2018, rejecting Shape's indemnification claims on several grounds. Doc. 32-4, PageID 1262. First, the Bidwells noted that the APA required Shape to submit evidence supporting its purported indemnification claims but that Shape had submitted none. *Id.* Second, the Bidwells noted the APA required Shape to seek recovery under insurance policies before making indemnification claims, and there was no indication Shape had done that. *Id.* at 1263. Finally, the Bidwells contended that the expenses Shape identified were not indemnifiable under the terms of the APA. *Id.* at 1263–65.

Shape responded on January 29, 2019. Doc. 32-5, PageID 1267. It disputed the positions the Bidwells took in their letter and made an additional indemnification claim for failure by the Bidwells to prepare their financial statements according to Generally Accepted Accounting Principles ("GAAP"). *Id.* at 1268. Shape informed the Bidwells that it would not pay the $5 million due on March 31, 2019, claiming it was entitled to be indemnified for $7.96 million and to set off that amount against any amount it owed under the APA as amended.

8

*Id.* Thirteen days later, on February 11, 2019, Shape provided what the Bidwells have characterized as "limited documentation" supporting its Indemnification Notice. Doc. 32, PageID 931.

## II.    PROCEDURAL HISTORY

The parties' dispute over the unpaid installments due under the APA and over the unresolved indemnification claims eventually erupted into this litigation. On February 12, 2019, the Bidwells sued Shape in the Court of Common Pleas, Butler County, Ohio. Doc. 1-3, PageID 12. The Bidwells alleged anticipatory breach of contract, and fraud in the inducement for representations Shape made when negotiating the APA Amendments. *Id.* at PageID 27–28. The Bidwells sought a declaratory judgment that they were entitled to the full $20 million in deferred payments Shape agreed to make under the APA and its amendments. *Id.* at PageID 29.

On March 14, 2019, Shape filed a notice of removal in this Court. Doc. 1, PageID 1.[1] Thereafter, on June 11, 2020, the Bidwells filed an Amended Complaint and Shape filed its Answer on June 24, 2020. Along with its answer Shape filed counterclaims alleging breach of contract and fraud in the inducement, claiming that the Bidwells provided Shape inaccurate information regarding the 2018 Expansion Project and breached other guarantees made in the APA. Defendant's Answer and Counterclaims, Doc. 33, PageID 1270.

_____

[1] On April 11, 2019, the Bidwells filed a motion to have this Court to remand the case back to the Common Pleas Court for Butler County on the grounds that the APA contained a forum selection clause providing that the parties submitted exclusively to the jurisdiction of federal and state courts located in that county, which this Court is not. Doc. 15, PageID 444.  The Court denied the Bidwells' motion to remand on the grounds that the APA did not contain a "clear and unequivocal" waiver of the right of removal to federal court. Doc. 27, PageID 891.

On August 31, 2021, the Bidwells filed the Motion presently before the Court.[2] They seek summary judgment on the following claims: (1) the Bidwells' declaratory judgment and breach of contract claim; (2) Shape's counterclaim for breach of contract; and (3) Shape's counterclaim for fraudulent inducement. Doc. 113, PageID 13877. The Motion is fully briefed and ripe for adjudication.

## III. STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The 'party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp.*, 477 U.S. at 323). But the non-moving party cannot defeat summary judgment merely by pointing to any factual dispute. Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor,*

---

[2] In August 2020, the Bidwells filed a Motion for Partial Judgment on the Pleadings. Doc. 39, PageID 1324. During the time that the Motion for Partial Judgment on the Pleadings was under review, however, the Bidwells filed the instant Motion. Thus, the Court denied the Bidwells' Motion for Partial Judgment on the Pleadings as moot. Doc. 126.

*Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (alteration and emphases omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). In other words, the dispute must be "genuine" (*i.e.*, supported by evidence) and go to a "material fact" (*i.e.*, a fact that could matter to the outcome).

"The inquiry on a summary judgment motion or a directed verdict motion is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citation and internal quotation marks omitted). In making this determination, "the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)) (alteration omitted). *See also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## IV.     LAW AND ANALYSIS

Remarkably little has changed regarding the underlying claims in this case since Shape sent its indemnification notice in November 2018. To summarize, the Bidwells contend that Shape agreed to pay $20 million in four annual installments of $5 million, beginning in March 2019. As conceded by its counsel at the Court's November 22 hearing, Shape does not dispute this assertion, but maintains instead that it is entitled to a set off of the enumerated indemnification claims that have been asserted under the APA, including for all expenses Shape has incurred pursuing those claims and its litigation costs.

11

In total, Shape contends that it is entitled to indemnification for expenses associated with the Duke Energy One contract that had not been fully disclosed pre-closing; costs incurred for completing "hardscaping" (grading and paving) at the Trenton, Ohio facility; for the Bidwells' alleged mismanagement of the transfer of manufacturing operations from the Indianapolis plant to Trenton; for damages Shape allegedly suffered from Magnode's financial statements not being reported in accordance with GAAP; and from purported environmental violations that existed at Magnode prior to closing that Shape had to correct in order to meet legal requirements. Shape Proposed Undisputed Facts ¶¶ 553, 539, 543, 549, 550, 551, 552, 556, Doc. 121-1.

In the litigation, Shape asserts the indemnification claims as defenses to the Bidwells' declaratory judgment and breach of contract action. The indemnification claims Shape asserts also form the basis of its breach of contract counterclaim, on which the Bidwells are also seeking summary judgment. Shape Counterclaims, Doc. 33, PageID 1294–95; Motion, Doc. 113, PageID 13877. Additionally, the Bidwells seek summary judgment on Magnode's counterclaim for fraudulent inducement. Doc. 113, PageID 13877.

The Court proceeds to address each of Shape's indemnification claims. This analysis determines resolution of the Motion as to the Bidwells' declaratory judgment and breach of contract claims, as well as Shape's breach of contract counterclaim. The Court then addresses Shape's fraudulent inducement counterclaim.

### A. Shape Obligation to Pay $20 Million

As a preliminary matter, the Court notes that the unambiguous terms of the APA and its amendments required Shape to pay to the Bidwells $5 million annually, beginning on March 31, 2019 and continuing for four years, for a total of $20 million. Doc. 32-2, PageID

1248. This obligation is uncontested. Doc. 121-1, PageID 14631. However, Shape is entitled to set off any valid losses that may be indemnifiable under the APA. Doc. 32-2, PageID 1248–49.

### B. Shape Indemnification Claims

Shape's indemnification claims are at the crux of this dispute. The Court proceeds to consider whether Shape has created a genuine issue of material fact with respect to the validity of each of its indemnification claims. *See Celotex Corp.*, 477 U.S. at 325.

It is undisputed that the APA "narrows the types of post-closing expenses for which Shape may seek indemnification to these three categories: (a) any inaccuracy in or breach of any of the representations or warranties of [Magnode] or [The Bidwell Family;] (b) any breach or non-fulfilment of any covenant, agreement, or obligation to be performed by [Magnode] or [The Bidwell Family]; or (c) any Excluded Asset, any Excluded Liability or Cost Over Runs." Shape Responses to Proposed Undisputed Facts, Doc. 121-1, PageID 14629 (alterations in original) (quoting APA § 9.02(a)-(c)).

The Court considers each of Shape's indemnification claims in turn, bearing in mind that to succeed, each claim must fit into one of the concededly "narrow[]" categories set forth above. *Id.*

### i. Duke Energy One Contract

Shape argues that it is entitled to indemnification for expenses it incurred under a Magnode contract with the utilities supplier Duke Energy One, LLC, *id.* at PageID 14848, which was amended in 2017, shortly before the deal with Shape closed. *Id.* at PageID 14633–34. Shape admits that it expressly assumed the relevant Duke Energy One contract in the APA. *Id.* at 14640. Shape also concedes, reluctantly, that it had opportunities to learn more

13

about this contract during the due diligence phase of the negotiations. While it quibbles over the details, it admits that the relevant contracts were placed in the data room for its review, *id.* at 14639–40, and that Shape employees met with representatives from Duke Energy before closing. *Id.* at 14638.[3]

Shape seeks indemnification for the Duke Energy One contract (the "Duke contract") as a Cost Over Run under APA § 9.02(c). Doc. 32-3, PageID 1257; Doc. 33, PageID 1289–90.  As relevant here, Cost Over Runs are defined to include: "(ii) any amounts paid to Seller by Buyer at Closing, assumed by Buyer at Closing or incurred by Buyer following Closing with respect to the 2018 Expansion Project in excess, in the aggregate, of $10,997,000." APA Article I, Doc. 32-1, PageID 948. The 2018 Expansion Project is defined as the "acquisition and installation of the Ube Press and related [activities] . . . as more particularly described on Exhibit E hereto."[4] *Id.* at PageID 959. In order to be indemnifiable as a Cost Over Run, then, the Duke contract must be related to the acquisition and installation of the Ube Press.

As to the Duke contract, Shape has not raised a "genuine issue of material fact," *Celotex Corp.*, 477 U.S. at 323, relative to this contract constituting a Cost Over Run indemnifiable under APA § 9.02(c). First, the Duke contract is not "related" to the acquisition and installation of the Ube Press; therefore, expenses incurred by Shape for this contract do not, from the outset, appear to be expenses associated with the 2018 Expansion Project. Second, Exhibit E, referenced in the APA's definition of the 2018 Expansion Project, confirms that

---

[3] The Duke contract for which Shape has claimed indemnification is a contract for electrical support services, not a utility contract. *See* Duke contract, Doc. 40, PageID 1353.

[4] The full definition is provided in Section I *supra*.

14

the parties did not intend to include the cost of the Duke contract among the expenses for which Shape could be indemnified as Cost Over Runs. Doc. 108-2, PageID 12258.

As to the definition of the 2018 Expansion Project in the APA, Shape contends the Duke contract qualifies as "support equipment" related to installation of the Ube Press. Doc. 121, PageID 14600. The key point here is that to qualify as "support equipment" that is part of the 2018 Expansion Project, the Duke contract must be "related" to the acquisition and installation of the Ube Press. Doc. 32-1, PageID 959. To the contrary, the evidence adduced shows the Duke contract provided for Duke to provide electrical equipment, maintenance, and service for the entire Magnode Trenton facility, rather than solely electrical equipment that would facilitate the "acquisition and installation" of the Ube Press. Doc. 113-1, PageID 13895–96. For example, the testimony of Mark Butterfield, who managed the 2018 Expansion Project, Butterfield Dep. Tr. Doc. 101, 35:21–25, and after the acquisition became managing director of the Magnode facility for Shape, Doc. 121-1, PageID 14621, showed that Duke provided and serviced equipment throughout Magnode's Trenton facility, *not* only at Building 6, where the Ube Press was housed. Doc. 100, PageID 8258. In fact, Mr. Butterfield was unable to identify specific pieces of equipment installed by Duke Energy One for Building 6. *Id.* at PageID 8260. Because the Duke contract generally provided for electricity-related services for Magnode's entire Trenton facility, it is evident that it was not "support equipment" related to the "installation and acquisition" of the Ube Press.

Shape's argument that the Duke contract was "essential for the 2018 Expansion Project to result in an operational Ube Press," Doc. 121 at PageID 14601, is unavailing. The fact that services are essential for the 2018 Expansion Project to result in an operational Ube Press *does not* mean that they are part of the 2018 Expansion Project as that term is defined in

15

the parties' contract. A hypothetical illustrates the point: say that the Bidwells had rented the land on which Building 6 sits; to be able to continue to operate in Building 6 and use the Ube Press inside Magnode would need to pay rent to the landlord. In this hypothetical scenario, rent would *not* be an indemnifiable expense, even though paying rent *would be* essential for successful operation of the press. The APA plainly does not require the Bidwells to indemnify Shape for *all* ordinary expenses that are necessary to the operation of the Ube Press, even if those expenses are purportedly "essential for the 2018 Expansion Project to result in an operational Ube Press."[5] The Court must, of course, "give effect to the words used, not insert new words." *Fendley v. Wright State Univ.*, 2019-Ohio-1963, ¶ 17 (10th Dist.).[6]

Exhibit E further supports the conclusion that there is no genuine issue as to whether the Duke contract was a Cost Over Run indemnifiable under the APA. After the list of categories of expenses in the contract definition of the 2018 Expansion Project, that definition

Exhibit E
Certain Closing 2018 Expansion Project Amount Expenditures

| | | Monthly Payment Schedule | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 16 Dec. | 17 Jan | 17 Feb | 17 Mar | 17 Apr | 17 May | 17 Jun | 17 Jul | 17 Aug | 17 Sep | 17 Oct | 17 Nov | 17 Dec | 18 Jan | 18 Feb | |
| Building | $2,760,000 | | $35,000 | $35,000 | $60,000 | $125,000 | $250,000 | $290,000 | $600,000 | $300,000 | $290,000 | $290,000 | $290,000 | $265,000 | | | |
| Site Work (Grading, Drives, Parking) | $100,000 | | | | | | | | | | | $50,000 | $50,000 | | | | |
| Cranes | $160,000 | | | | | | | $40,000 | | | $25,000 | | | $87,000 | | | |
| 3300 Ton UBE Press | $2,500,000 | $725,000 | | | | | | $25,000 | | | | $1,140,000 | | $250,000 | | | |
| Puller, Stretcher, Saw, Handling System | $2,140,000 | | $214,000 | | $107,000 | $107,000 | $107,000 | $214,000 | $214,000 | $214,000 | $214,000 | $214,000 | $107,000 | $214,000 | | $214,000 | |
| Log Table / Oven / Hot Saw / Transfer / Taper Quench / Sup Sys / Bonus | $535,000 | | $93,500 | | $46,750 | $46,750 | $46,750 | $93,500 | $93,500 | $93,500 | $93,500 | $93,500 | $46,750 | $93,500 | | $93,500 | |
| Age Oven System | $490,000 | | $49,000 | | $24,500 | $24,500 | $24,500 | $49,000 | $49,000 | $49,000 | $49,000 | $49,000 | $24,500 | $49,000 | | $49,000 | |
| Tooling - Inventory (Stems, Rings, Adapters, Containers, Blades, Etc.) | $560,000 | | | | | | | | $9,000 | $9,000 | $9,000 | $32,000 | $32,000 | | | | |
| Cooling Tower & Piping | $50,000 | | | | | | | | $25,000 | | | | $14,000 | | | | |
| R O Unit & Piping | $48,000 | | | | | | | | $12,000 | | | | | | | | |
| Air System & Piping | $56,000 | | | | | | | | | | | | | $38,000 | | | |
| Die Ovens | $124,000 | | | | | | | | | | | | | $56,000 | | | |
| Part Inventory | $170,000 | | | | | | | | $11,000 | | | | | | $103,000 | $35,000 | |
| Nitrogen Cooling Tower | $45,000 | | | | | | | | | $38,000 | | | | $27,000 | | | |
| Die Rack Storage | $25,000 | | | | | | | $15,000 | | | | $10,000 | | | | | |
| Electric (Includes Duke Capital) | $240,000 | | | | | | | | | | | $115,000 | | | | $115,000 | |
| Utility Runs | $60,000 | | | | | | | | | | | $26,333 | $26,333 | | $26,334 | | |
| Outside Engineering, Programming | $25,000 | | | | | | $12,000 | | | | | | | | $13,000 | | |
| Project Costs: Travel UBE, APEL, Gramco | $30,000 | $3,000 | | $4,000 | $1,000 | | | $4,000 | $1,000 | | $4,000 | $1,000 | | $125,000 | $125,000 | $125,000 | |
| Rigging & Trades (Gramco - UBE) | $375,000 | | | $5,000 | $10,000 | $15,000 | | | | | | | | | | | |
| Building Permits | $30,000 | | | | | | | | | | | $10,000 | | | | | |
| Shipping Permits | $10,000 | | | | | | | | | | | | | | | | |
| Support Equipment / Items (Cameras, Security, Etc.) | $60,000 | | | | | | | | | | | | | $38,000 | $30,000 | | |
| Grand Total | $10,557,000 | $729,000 | $391,500 | $48,000 | $275,250 | $330,250 | $449,250 | $1,432,500 | $1,057,500 | $708,500 | $736,500 | $2,842,833 | $622,583 | $1,312,500 | $285,334 | $651,500 | $10,357,000 |

[5] This analysis holds even if, as Shape contends, the Bidwells amended the Duke contract to avoid making an upfront payment for new electrical infrastructure at the Trenton facility and instead spread-out payments for electrical infrastructure over time. *See* Shape Response, Doc. 121, PageID 14603–04. This is only to say that Magnode was locked into a contract that Shape viewed as disadvantageous, something that the Bidwells do not dispute. It does not allow Shape to shoehorn the contract into the narrow category of expenses for which the Bidwell promised to indemnify Shape.

[6] The contract is governed by Ohio law. APA § 11.10, Doc. 32-1, PageID 1021.

states those expenses are "more particularly described on Exhibit E." Doc. 32-1, PageID 959.
Exhibit E, Doc. 108-2, PageID 12258, is pictured above.

Shape's argument turns on the item "Electric (includes Duke Capital)", for which
$230,000 was budgeted, with one payment of $115,000 to be made in October of 2017 and
one payment of $115,000 to be made in February of 2018.[7] Doc. 121-1, PageID 14653. Shape
argues that the term "Electric (includes Duke Capital)" is "blatantly ambiguous" and that a
jury could conclude that the term refers to the Duke contract, thus rendering the cost of the
Duke contract indemnifiable. *See* Shape Response to Motion for Summary Judgment, Doc.
121, PageID 14602; Mark White 30(b)(6) Dep. Tr., Doc. 108, PageID 12105.[8]

Read in context, Exhibit E does not support Shape's interpretation. Exhibit E includes
$230,000 in expenses for "Electric (includes Duke Capital)" to be paid in two installments
toward the end of the period identified. Any inference that this item refers to Duke Energy
One which could be drawn from the title of the line-item is dispelled by the scale of the costs
identified and the schedule on which they were to be paid. These costs were much lower than

---

[7] The timing in Exhibit E was out-of-date, and Shape has represented that the Exhibit was taken from a chart Mark Butterfield drew up in 2016, when negotiating with a bank for funding. Shape Responses to Proposed Undisputed Facts, Doc. 121-1, PageID 14651.

[8] Notably, Shape does not assert that the line "Electric (includes Duke Capital)" referred to the Duke contract. *See* M. White Rule 30(b)(6) Dep., Doc. 108, PageID 12104 ("The 230,000 did not include the ongoing monthly cost for Duke Energy One."). Shape instead asserts that the term was ambiguous and the Bidwells *should have* informed Shape of the Duke Energy One contract. *Id.* ("Never was – never was it raised that the Bidwells entered into a long-term agreement to defer cash to Shape post-close that we are now responsible for, a multi-million dollar agreement, to provide enough electric juice to run the place."). For the issue of the Duke contract to go to a jury, Shape must raise a genuine issue of fact as to whether the line "Electric (includes Duke Capital)" *referred to* the Duke contract or otherwise suggested that the contract was included in the 2018 Expansion Project. To do so, Shape would need to raise a genuine issue as to whether the contract was ambiguous *and* offer extrinsic evidence supporting its interpretation that the 2018 Expansion Project included the Duke contract. Shape has failed to present such evidence. Indeed, the Court is left with the impression Shape does not believe Exhibit E included Duke Energy One among the 2018 Expansion Project costs but believes the Bidwells should have notified Shape of the Duke contract as a significant business liability.

the cost of the Duke contract and were paid on a different schedule. Shape had access to the Duke contract and could have compared it to this line-item; if it had done so,[9] it would have reached the conclusion that this line-item could not refer to the Duke contract. No fair-minded fact-finder could reach a contrary conclusion, so the Bidwells are entitled to summary judgment on this issue. *See Kay v. American Nat'l Red Cross*, No. 2:09-cv-351, 2011 WL 13302690 at *3 (S.D. Ohio Mar. 14, 2011) ("The Court may . . . enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence.").

To summarize, the Duke contract did not concern "support equipment" related to the acquisition and installation of the Ube Press, so it was not part of the 2018 Expansion Project. And Exhibit E further confirms that this contract was clearly not part of the 2018 Expansion Project.

### ii. Hardscaping

Shape also argues that it is entitled to indemnification for costs incurred in "hardscaping" (grading and paving) the Magnode Trenton facility. In its indemnification notice, Shape contended it expected to pay "$1.2 million to hardscape the Trenton Facility and complete the 2018 Expansion Project." Doc. 32-3, PageID 1257. Shape now calculates its indemnifiable hardscaping expenses at $977,337: it seeks "indemnification for the portions necessary to complete the 2018 Expansion Project and ensure the safety of its employees, at a cost of $977,337." Doc. 121, PageID 14605.

---

[9] The evidence adduced in discovery, including internal communications between Shape personnel, indicates Shape did not closely review the Duke contract during the due diligence phase. In a chat between Shape employee Christine Dochod and Shape CFO Mike Lieto in May 2018, Ms. Dochod asked, "from our side who dropped the ball and didn't read the contract?" Christine Dochod Dep., Ex. 10, Doc. 91-10, PageID 4265.

The parties do not dispute that the Bidwells agreed to indemnify Shape for Cost Over Runs related to certain hardscaping needed for the Trenton facility. Nor do they dispute that Shape "decided to hardscape the entire Trenton facility," eventually performing hardscaping that was unrelated to Building 6, and thus not indemnifiable. *Id.* The Court is thus left to determine under the provisions of the APA what hardscaping expenses incurred by Shape, if any, *are* attributed to Building 6 and indemnifiable as Cost Over Runs.

The Bidwells argue strenuously that they have properly challenged Shape to "put up or shut up," on its indemnification claim for hardscaping and Shape has failed to "put up." *See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989).

The Court agrees. The evidence Shape has presented on indemnifiable hardscaping expenses is unreliable, incomplete, and inconsistent with the terms of the APA. Shape thus has not come forward with sufficient evidence to raise a genuine issue on this indemnification claim.

Shape substantiates its $977,337 hardscaping indemnification claim with the expert report of its damages experts, Brian Lappen and Jason Carano. Doc. 121, PageID 14605. Their methodology was as follows: they spoke with Shape's Director of Safety & Environmental, Mike Westbrook, who identified certain areas of the Trenton facility that were hardscaped "to make the facility both operational in connection with the 2018 Expansion Project and to satisfy health and safety regulations." Lappen & Carano Rep., Doc. 98-4, PageID 6969–70. They then determined what percentage that made up of all the hardscaping Shape completed in 2018–19 (57.66%) and multiplied that percentage by the total bill for hardscaping ($1,695,000). *Id.* Thus, they "estimate[d] the total hardscaping costs incurred by Shape to complete any work related to the 2018 Expansion Project and to satisfy

health and safety regulations at the facility is $977,337 (i.e. $1,695,000 multiplied by 57.66%)." *Id.* at PageID 6970.

This methodology does not comport with the terms of the contract in two important respects. First, it is on its face inconsistent with the terms of the contract. Lappen and Carano describe their estimate as the costs incurred to complete work "related to the 2018 Expansion Project *and to* satisfy health and safety regulations at the facility." *Id.* (emphasis added). This is inconsistent with APA definition of Cost Over Runs, defined to include only costs incurred "with respect to the 2018 Expansion Project." Doc. 32-1, PageID 948. The definition of Cost Over Runs does not mention "health and safety regulations at the facility," nor does the definition of the 2018 Expansion Project. The Court thus need go no further than comparing the language of Lappen and Carano's report with the definition of Cost Over Runs in the APA to conclude Shape's experts failed to calculate the cost of hardscaping that legitimately qualifies as a Cost Over Run. They included in their calculation the cost of hardscaping that was never part of the APA definition of Cost Over Runs.[10] Therefore, those expenses are not indemnifiable.

Second, deposition testimony confirms that the hardscaping for which Lappen and Carano estimated the cost was not the hardscaping for which the Bidwells agreed to indemnify Shape in the APA. In order to calculate the hardscaping indemnifiable under the APA, Lappen and Carano spoke with Mike Westbrook, Shape's Director of Safety &

_____

[10] Additionally, the contention that hardscaping was necessary to "satisfy health and safety regulations" is unsubstantiated. While there is a separate provision of the APA that allows Shape to be indemnified for expenses incurred to bring Magnode into compliance with environmental regulations, *see* discussion *infra* Section IV.B.v, Shape has not sought indemnification for hardscaping under that provision and regardless has failed to adduce evidence showing that the hardscaping it did was necessary to comply with environmental regulations.

Environmental/Corporate Compliance Officer. They understood that the areas included in their calculation were hardscaped "at the direction of Mr. Westbrook to make the facility both operational in connection with the 2018 Expansion Project *and to satisfy health and safety regulations.*" Doc. 98-4, PageID 6969 (emphasis added).

Mr. Westbrook's calculation of indemnifiable hardscape is inconsistent with the APA's definition. In deposition testimony, Mr. Westbrook explained that he did not refer to the APA when he determined the indemnifiable portions of hardscape. Westbrook Dep. Tr., Doc. 112, 44:18–22 ("Q[:] . . . [Y]ou never referenced the definition of the 2018 expansion project in the APA, correct? A[:] I was never tasked with -- none of that []ever came into my mind."). Instead, to identify indemnifiable portions of hardscape, he identified hardscaping that was part of what he described as a "construction project" that included installation of a demand saw in Building 4 of the Trenton facility, conversion of Building 5 to a new use, and new construction of Building 6. *Id.* at 40:8–14. Mr. Westbrook further testified that there was a "health and safety aspect" of his calculation of the "construction project's scope of hardscaping," as he included hardscaping needed for safety related to the construction project. *Id.* at 43:9–44:11. Mr. Westbrook's calculation of indemnifiable hardscape—on which Shape's experts relied—includes hardscape unrelated to the 2018 Expansion Project, including hardscape related to work at Buildings 4 and 5, and hardscaping done for "health and safety" reasons. The added buildings and health and safety concerns addressed in Westbrook's deposition testimony are completely out of sync with the contractual definition of Cost Over Runs, which requires indemnifiable expenses to be related solely to the 2018 Expansion Project. Doc. 32-1, PageID 947–48.

The testimony of Mark Butterfield confirms that Shape's estimate of hardscaping attributable to the 2018 Expansion Project is unreliable. Mr. Butterfield testified that only a limited portion of hardscaping Shape conducted was related to Building 6 and thus related to the 2018 Expansion Project. Butterfield Dep. Tr. I, Doc. 101, 84:17–21 ("Q[:] [T]his exhibit here, this does not represent the areas that were supposed to be hardscaped as part of the 2018 expansion project; correct? A[:] They weren't the areas relative to the expansion of building 6."). Mr. Butterfield was familiar with the APA, and with Exhibit E, which he originally drafted.[11] Thus to the extent this Court finds the APA ambiguous with respect to indemnifiable hardscaping it may consider his testimony as extrinsic evidence. *See Urban Associates, Inc. v. Standex Electronics, Inc.*, 216 Fed. Appx. 495, 506 (6th Cir. 2007) ("[E]xtrinsic evidence may include a contracting party's own statement about what he understood the disputed contract term to mean when he wrote, negotiated, or signed the contract."). His testimony confirms that the extensive hardscaping for which Shape seeks indemnification does not qualify as a Cost Over Run.

Having determined that Shape's estimate of its indemnifiable hardscaping expenses is unsupported by the APA, it would be improper for the Court to attempt to independently estimate that figure.[12] Instead, it is enough to say Shape has failed to substantiate its

---

[11] *See* Shape Responses to Proposed Undisputed Facts, Doc. 121-1 at PageID 14651.

[12] Shape asserts that the hardscaping Mr. Butterfield identified as associated with the 2018 Expansion Project "constitutes 23.2% of the Trenton facility and, based on the calculations of Shape's experts, would cost close to $400,000 to hardscape." Doc. 121, PageID 14605. This assertion is based only on a sketch Mr. Butterfield made during a deposition, and that sketch, moreover, is not the basis of Shape's indemnification claim for hardscaping. As a result, this assertion does not raise a genuine issue of material fact as to the validity of Shape's hardscaping indemnification claim.

hardscaping indemnification claim. For that reason, the Bidwells are entitled to summary judgment on this indemnification claim.

### iii.     Indianapolis Transfer

Shape seeks indemnification for nearly $5 million it claims to have spent as a result of the Bidwells' alleged breaches of two covenants made regarding operation of the business in the months leading up to closing: (1) APA § 7.01(a), a covenant to conduct the business "in the Ordinary Course of Business" and to "maintain and preserve intact its current business organization," Doc. 32-1, PageID 998;[13] and (2) APA § 7.01(c), a covenant to promptly notify Shape of any "event, circumstance, or fact which would be reasonably expected to result in the inaccuracy or breach" of any guarantees in the APA. *Id*. at PageID 999.[14] Shape seeks indemnification for these purported violations under APA § 9.02(b).

_____

[13] The covenant reads in full:

> From the date of this Agreement until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer (which requests for consent will be considered in good faith by Buyer), Seller shall use commercially reasonable efforts to (i) conduct the Business in the Ordinary Course of Business; and (ii) maintain and preserve intact its current Business organization, operations, and franchise and to preserve the rights, franchises, goodwill, and relationships of its Employees, customers, lenders, suppliers, regulators, and others having relationships with the Business. From the date hereof until the Closing Date, except as consented to in writing by Buyer (which requests for consent will be considered in good faith by Buyer), Seller shall not take any action that causes any of the changes, events or conditions described in Section 4.05 to occur.

> APA § 7.01(a), Doc. 32-1, PageID 998.

"Ordinary Course of Business" is defined as follows: "in accordance with the ordinary and customary day-to-day operations of the Business consistent with its past practice with respect to the activity in question." Doc. 32-1, PageID 954.

[14] The covenant reads in full:

> Prior to the Closing, Seller shall, promptly notify Buyer after obtaining actual knowledge of the occurrence (or non-occurrence) of any event, circumstance, or fact which would be reasonably expected to result in the material inaccuracy or breach of any representation, warranty, covenant, or agreement applicable to Seller set forth herein, or which would be reasonably expected to result in the failure of a Closing condition of Seller under ARTICLE VII."

Specifically, Shape argues that the Bidwells mismanaged the closing of their Indianapolis production facility and transfer of operations to the Trenton, Ohio facility, "leading to customer shut downs both before and after Closing" and that ultimately, "Shape was forced to spend nearly $5 million, which radically exceeded the Bidwells' forecasts." Doc. 121, PageID 14596. These costs are from unforecasted freight expenses ($935,664), employee overtime ($908,070), temporary labor ($1,543,527), customer chargebacks, *i.e.* amounts deducted by customers from invoices owed Magnode because of problems with Magnode service or product quality ($875,161), and loss of business income ($553,273). Lappen & Carano Rep., Doc. 98-4, PageID 6953.

The Bidwells seek summary judgment with respect to these claims on three separate grounds, each of which they argue is an independently adequate basis on which to grant summary judgment. First, the Bidwells argue that Shape's claims related to the Indianapolis Transfer are time-barred because the APA guarantees at issue did not survive the closing date, and the parties agreed that claims under expired covenants were barred unless Shape gave notice of those claims prior to expiration. Doc. 113-1, PageID 13900. Second, the Bidwells argue that Shape has failed to raise a genuine issue of material fact as to whether the Bidwells violated any covenant applicable to the Indianapolis transfer. *Id.* at PageID 13901. Third, the Bidwells argue that Shape has failed to raise a genuine issue of fact as to whether the damages it claims were caused by the breaches it alleges. *Id.* at PageID 13912.

The Court addresses each of the Bidwells' arguments in turn.

---

APA § 7.01(c), Doc. 32-1, PageID 999.

### a. Claims Time-Barred

The Bidwells first argue that per the terms of the APA, Shape is not permitted to bring claims for breaches of covenants that expired at closing unless it notified the Bidwells of those claims *prior* to closing. *Id*. at PageID 13901.[15] Because the covenants in § 7.01(a) and (c) related only to pre-closing conduct, then, Shape was required to notify the Bidwells of any claims under those covenants prior to closing. But Shape did not comply with this obligation and only notified the Bidwells of these claims in the Indemnification Notice delivered on Nov. 27, 2018. Doc. 32-3, PageID 1256.

Shape does not contest that the relevant covenants covered only pre-closing conduct. Doc. 121, PageID 14598. Nor does it contest that it failed to notify the Bidwells of its indemnification claims prior to closing. *Id.* Rather, Shape argues that the Bidwells misinterpret § 9.01(a) as a "contractual statute of limitations" whereas it instead "stands for the unremarkable proposition that covenants expire at the time of closing unless otherwise provided." *Id.* at PageID 14599. Shape thus argues that § 9.01 imposed no independent time

---

[15] The relevant provision, APA § 9.01, provides:

> **Survival.** Subject to the limitations and other provisions of this Agreement, the representation and warranties contained herein shall survive the Closing Date and shall remain in full force and effect until the date that is twelve (12) months from the Closing Date. None of the covenants or other agreements contained in this Agreement shall survive the Closing Date other than those which by their terms contemplate performance after the Closing Date, and each such surviving covenant and agreement shall survive the Closing for the period contemplated by its terms. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of such survival period and such claims shall survive until finally resolved."

> Doc. 32-1, PageID 1011.

limit on when Shape could bring indemnification claims based on the Bidwells' pre-closing conduct.

Shape has the better of this argument. In *Arcade Co. Ltd. v. Arcade, LLC*, the Sixth Circuit applied Ohio law to interpret a survival clause similar to the clause at issue here. 105 Fed. Appx. 808, 810 (6th Cir. 2004). That clause provided that the representations and warranties in the agreement survived closing for a one-year period. *Id*. The defendant in that case claimed that this amounted to an "express one-year contractual statute of limitations" barring claims on the contract made after one year. *Id*. The court concluded, however, that under Ohio law, "something more than this language [was] required to support a finding that the parties intended to modify the statute of limitations." *Id*. at 810–11. Because the survival clause at issue in that case did not "include[] specific language of limitation on the time within which to bring lawsuits or claims," the court would not "infer an intent to create a contractual limitation period." *Id*. at 811. Following *Arcade*, the Ohio Court of Appeals in *Shoregate Towers Partners L.L.C. v. Antebi* similarly found a Survival Clause lacked the "unequivocal language" necessary to create a contractual limitation period. 2021-Ohio-2688, ¶ 108 (8th Dist.).

Turning back to the present case, the APA similarly lacks the "unequivocal language," *id.*, required under Ohio law to limit the time period in which Shape could make its indemnification claims. The Bidwells argue that the APA does contain such unequivocal language, pointing to the final sentence of § 9.01 which provides that claims notified "prior to the expiration date of the applicable survival period *shall not thereafter be barred* by the expiration of such survival period and such claims shall survive until finally resolved." Doc. 32-1, PageID 1011 (emphasis added). The only thing this sentence says unequivocally is that claims notified prior to expiration of the survival period will survive; while the inference could

26

reasonably be drawn that claims not so notified will not survive, the contract does not "unequivocally" say so. The Court concludes that § 9.01 is not sufficiently explicit to bar Shape's claims under § 7.01(a) and (c).[16]

### b. No Breach of Covenants

The Bidwells go on to argue that Shape has raised no genuine issue of material fact as to whether they breached either § 7.01(a) or (c). The Court will next analyze each of these clauses.

**§ 7.01(a).** In APA § 7.01(a), the Bidwells promised to use "commercially reasonable efforts" to conduct Magnode's business in the "Ordinary Course of Business" and "maintain and preserve intact" Magnode's operations between the date of signing (February 23, 2018) and close (March 5, 2018). Doc. 32-1, PageID 998. The Bidwells argue that Shape has failed to raise a genuine issue of material fact as to whether the Bidwells breached this covenant. They argue that Shape has identified no breach of this covenant in the relevant time period, and that to the extent Shape has asserted breaches, it cannot substantiate those claims because it has not offered expert testimony supporting those claims.

The Court agrees that Shape has failed to create a genuine issue of material fact as to whether the Bidwells breached § 7.01(a).

First, by its own terms § 7.01(a) applies only to the ten-day period between February 23 and March 5, 2018. The Bidwells rightly point out that the core conduct Shape complains

---

[16] In *Escue v. Sequent, Inc.*, the court found that a survival clause similar to the clause at issue here *did* operate to bar claims filed outside of the survival period. 869 F.Supp.2d 839, 846–48 (S.D. Ohio 2012). However, in that case the parties agreed that the survival period was meant to extinguish certain claims filed after that period— the dispute was over whether claims noticed before the survival period could be filed after the survival period. *Id.* at 848. Absent that agreement, the court's analysis would have been the same as the analysis in *Arcade Co. Id.*

of occurred outside that timeframe, and the Court agrees with the Bidwells that the only allegations Shape makes of conduct that occurred within that time frame are too vague to raise a triable issue of fact. Shape focuses primarily on what it claims was a haphazard and rushed shutdown of Magnode's Indianapolis production facility and transfer of equipment to the Trenton facility. *See, e.g.,* Doc. 121, PageID 14590 ("[T]he Bidwells did not begin to **consider** transferring equipment from Indianapolis until September 2017—months after the parties' Letter of Intent was executed.") (emphasis in original). Shape's other major complaint is that the Bidwells failed to build sufficient levels of "safety stock" or backup inventory, to ensure Magnode was able to continue supplying parts to customers during the move from Indianapolis to Trenton. *Id.* at PageID 14594. But these are complaints about decisions the Bidwells made *prior* to the actionable time period. In fact, the closest Shape gets in its Response to specifically alleging conduct within the actionable time period[17] is its claim that the Bidwells "haphazardly transferr[ed] equipment days before closing," *id.* at PageID 14591, and even more vaguely, that the Bidwells "burned customer goodwill in the days before Shape took over operations." *Id.* at PageID 14595. These vague assertions do not create a triable issue of fact as to whether Shape is entitled to indemnification for a breach of § 7.01(a).

Second, even if Shape had alleged conduct by the Bidwells in the actionable time period that it claims violated § 7.01(a), it failed to substantiate those claims with evidence. To defeat the Bidwells' Motion, Shape must "com[e] forward with evidence raising a triable issue

---

[17] The Bidwells argue that no conduct related to the transfer of equipment from Indianapolis to Trenton is actionable under § 7.01 because such a transfer of operations is not part of Magnode's day-to-day operations and so is not covered by the Ordinary Course of Business guarantee. Doc. 124, PageID 15747. However, § 7.01 requires the Bidwells to make commercially reasonable efforts to operate the business in the Ordinary Course of Business *and* "maintain and preserve intact its current Business organization, operations, and franchise . . ." APA § 7.01(a), Doc. 32-1, PageID 998. This second category makes conduct related to the Indianapolis facility transfer actionable if it was properly alleged and supported.

of fact," *BDT Prods., Inc. v. Lexmark Intern., Inc.*, 124 Fed. Appx. 329, 330 (6th Cir. 2005), on the Bidwells' use of commercially reasonable efforts. In order to do so, Shape must come forward with evidence on commercially reasonable standards in the automotive parts manufacturing industry with respect to the conduct at issue—decommissioning an existing production facility and transferring operations to a new production facility.

*Tom-Lin Enterprises, Inc. v. Sunoco, Inc. (R&M)* is instructive on the type of evidence Shape must present to defeat summary judgment. 349 F.3d 277, 282 (6th Cir. 2003). That case involved a challenge by service station operators to oil company Sunoco's pricing practices under an Ohio statute requiring that those prices "be set pursuant to reasonable commercial standards of fair dealing in the trade." *Id.* (quoting Ohio Rev. Code Ann. §§ 1302.18 and 1302.01(A)(2)). Plaintiffs did not offer expert testimony on whether Sunoco's practices were commercially reasonable. To meet their burden, then, plaintiffs needed to "produce background evidence of the manner in which other marketers of gasoline . . . set their prices." *Id.* at 282. The only evidence adduced during discovery on this point, however, was evidence of one other oil company's practices, which were the same as Sunoco's. *Id.* at 283. Apart from that piece of evidence, the record was "utterly devoid of any competent and relevant evidence of industry pricing standards, let alone, Sunoco's deviation from those standards." *Id.* at 283. As a result, the court determined that plaintiffs failed to raise a material issue of fact as to commercial reasonability.

Here, Shape proffered no expert who could opine that the Bidwells' conduct with respect to the Indianapolis facility transfer was not commercially reasonable. Thus, Shape needs to make its case with "background evidence," *id.,* on the manner in which other auto part suppliers manage facility transfers, along with testimony from lay witnesses indicating

the Bidwells' failure to comply with the standard. Shape contends it has elicited adequate background evidence on industry standards—including from the Bidwells' own expert, Michael Tracy—and that this evidence, in combination with fact witness testimony on the Bidwells' conduct, is adequate to raise a genuine issue of material fact. Doc. 121, PageID 14589–90 ("The Bidwells confirmed their familiarity with commercially reasonable standards during discovery. . . . Shape elicited expert testimony on the applicable industry standards during its cross-examination of Mr. Tracy.").

Shape relies primarily on the testimony of the Bidwells' expert, Michael Tracy, to present evidence on the applicable standard of care. This could prove problematic for Shape's ability to prove its case at trial. Because Mr. Tracy is the Bidwells' expert, the Bidwells may elect to *not* call him at trial, in which case it would be unlikely that Shape would be permitted to call him and thus unable to elicit his testimony on the applicable commercially reasonable standards. *See R.C. Olmstead, Inc. v. CU Interface, LLC*, 657 F. Supp. 2d 899, 904 (N.D. Ohio Mar. 5, 2009) ("[T]his Court adopts the majority rule and holds that, where a party identifies an expert as testifying under Rule 26(b)(4)(A), but subsequently redesignates the expert as non-testifying, the opposing party may only depose that expert upon a showing of "exceptional circumstances" under Rule 26(b)(4)(B)."). However, because the fact witnesses are familiar with the industry in question, the Court concludes that testimony on applicable industry standards could be elicited at trial from those fact witnesses, including the Bidwells themselves.[18] Thus, the Court proceeds to analyze whether Shape has raised a genuine issue

---

[18] The situation is analogous to the medical malpractice context, in which under Ohio law a defendant physician may be called by plaintiff to provide expert testimony on the relevant standard of care. *See Johnson v. Hammond*, 47 Ohio App.3d 125, 128 (8th Dist. 1988).

of fact as to whether the Bidwells failed to adhere to commercially reasonable standards, as testified to by Mr. Tracy and the fact witnesses in this case.

The Court concludes that Shape has failed to raise a genuine issue of material fact as to whether the Bidwells' conduct ran afoul of the applicable industry standards during the time period relevant to § 7.01(a). While Shape identifies several complaints with the way the Bidwells handled the Indianapolis facility transfer, it fails to raise a genuine issue of material fact as to whether any of the complained-of conduct violated standards of commercial reasonability. Much of Shape's argument turns on the Bidwells' handling of the Production Part Approval Process ("PPAP"), an auto industry standard process that suppliers go through when moving production to a new facility.[19] Shape notes that satisfying PPAP requirements is part of a supplier's obligations when using commercially reasonable standards to carry out an equipment transfer and that as of February 26, 2018 certain PPAPs had not been completed. Doc. 121, PageID 14593. They further argue that the Bidwells failed to maintain sufficient "safety stock" in Indianapolis to prevent any disruption for customers during the transfer of operations to Trenton, Ohio. *Id.*

Shape fails, however, to point to any specific industry standard with which the Bidwells did not comply. The closest Shape comes to doing so is to claim that the PPAP process was not complete at closing. But Shape presented no evidence that the PPAP process needed to be complete at closing in order for the Bidwells to adhere to industry standards. Shape points to challenges that arose in the PPAP process, such as the fact that securing PPAP approvals for certain customers was "nightmare-ish," Hinsey Dep. Tr., Doc. 93, 77:17–22,

---

[19] *See* M. Tracy Expert Rep., Doc. 97-2, PageID 6095.

but this is not evidence that the Bidwells failed to adhere to commercially reasonable standards in the PPAP process.[20]

By contrast, Mr. Tracy testified unequivocally that the Bidwells "planned and executed the Parts Transfer from Indianapolis to Trenton within the expectations of the automotive industry for this type of activity," and "met the expectations of the automotive industry for their quality activity [(PPAP)] conformance." M. Tracy Rep., Doc. 97-2, PageID 6099. Shape asserts that Mr. Tracy "fails to provide evidentiary support" for his conclusion that the Bidwells took necessary steps to carry out the transfer according to industry standards. Doc. 121, PageID 14590. This assertion is inaccurate, as Mr. Tracy's opinions are supported by deposition testimony and other matters of record, *see* Doc. 97-2, PageID 6103–08, and misinterprets the proper role of expert testimony in adversarial litigation—Mr. Tracy's role as an expert is to provide his *opinion* on matters requiring specialized expertise.

More to the point, it is Shape's burden to provide evidentiary support for its indemnification claim regarding the Indianapolis facility transfer. Shape has failed to do so, as it has failed to adduce expert or lay testimony—or any combination of the two—to support its claim. Ultimately, the case looks similar to *Tom-Lin Enterprises*. Here, like in that case, there is only one solid piece of evidence on industry standards—the testimony of Mr. Tracy—and that one piece of evidence indicates the Bidwells complied with industry standards.

Shape has thus failed to raise a genuine issue of material fact as to its indemnification claim under APA § 7.01(a) over the Bidwells' handling of the Indianapolis facility transfer.

---

[20] At certain times, Shape sought to adduce evidence of concrete failings by the Bidwells but did not succeed. *See* Hinsey Dep. Tr. Doc. 93, 202:22–25 ("Q. Did you have enough inventory? THE WITNESS: I believe we did, but it was very, very, very close.").

**§ 7.01(c).** Shape asserted in its counterclaims that the Bidwells also violated APA § 7.01(c), which required the Bidwells to notify Shape of any event between signing and closing that would be reasonably expected to cause any of the representations in the APA to become inaccurate, or cause a failure of any closing condition. Doc. 33, PageID 1294. The Bidwells argue that Shape has "identified no circumstance where Magnode failed to provide any required notice," and its claim for breach of § 7.01(c) "conflicts with the undisputed evidence." Doc. 113-1, PageID 13910–12.

Shape failed to respond to the Bidwells' argument, and that opportunity is thus "waived and its case wagered." *Guarino v. Brookfield Tp. Trustees*, 980 F.2d 399, 405 (6th Cir. 1992). This does not mean that the Bidwells automatically prevail on this issue, but it also does not mean the Court must search the record to determine whether Shape has any plausible response. Instead, the Court "must . . . intelligently and carefully review the legitimacy of such an unresponded-to motion, even as it refrains from actively pursuing advocacy or inventing the *riposte* for a silent party." *Id.* at 407.

With this directive in mind, the Court concludes that Shape has also failed to raise a genuine issue of material fact with respect to its claim for a breach of § 7.01(c). The record reflects that Shape was intimately involved in Magnode's operations during the period between signing and closing, when the guarantee of § 7.01(c) was in effect. *See* D. Howell Dep. Tr. Doc. 92, 81:2–81:7 ("Q. Before close, do you remember any Shape employees coming to the Magnode Corp campus? A. Yes. They were like troops coming down the hallway. Q. Were they there regularly? A. They were flying in once a week. Yes, they were."). Further, the record reflects that Magnode's Mark Butterfield, who was involved in running Magnode's Trenton facility pre- and post-closing, discussed with Shape in the days prior to

close, problems that Magnode was facing with customers. M. Butterfield Dep. Tr. Doc. 102, 134:11–136:15. The record reflects that Magnode leadership was in close communication with Shape during the time period relevant to § 7.01(c), including with respect to problems that arose in the business. Shape has thus failed to raise a genuine issue of material fact as to whether the Bidwells violated the § 7.01(c) notice requirement.

**c.**        **No Damages**

The Bidwells also assert that they are entitled to summary judgment with respect to Shape's claims under § 7.01(a) and (c) because Shape has failed to adequately substantiate its claims for damages under either of those provisions. The Court addresses these provisions in order.

**§ 7.01(a) damages.** The Court agrees with the Bidwells that even if Shape had raised a genuine issue of material fact as to a breach of § 7.01(a), summary judgment would nonetheless be warranted because Shape failed to raise such a genuine issue as to whether it suffered damages as a result of the alleged breach. In order to prevail on its indemnification claim, Shape would need to prove that its claimed damages were "based upon, arising out of, with respect to, or by reason of" the claimed breach. APA § 9.02, Doc. 32-1, PageID 1011–12. Under Ohio law, expert opinions must "rise to the level of probabilities" to be admitted, *Claris, Ltd. v. Hotel Dev't Servs., LLC*, 2018-Ohio-2602, ¶ 32 (10th Dist.), and in the context of a claim for damages under a contract, this means an expert must "express . . . in terms of probability" whether the alleged breach was a "substantial factor" in bringing about the claimant's damages. *Id.,* ¶ 42.

Applying these rules, Shape's expert damages calculations are inadequate. Rather than determining what harm Shape suffered as a result of the Bidwells' alleged failure to adhere to

34

commercially reasonable standards, Shape's experts primarily compared Magnode's expenses in certain categories post-Closing to the historical experience of the company. *See* Doc. 121, PageID 14596; Lappen & Carano Rep., Doc. 98-4, PageID 6952–64. Lappen and Carano's Report does not purport to disentangle disruption to Magnode's activities caused by the Indianapolis Facility Transfer itself—which was an involved process that would necessarily cause some disruption—from the disruption caused by the Bidwells' purported mishandling of it. As one example, they calculated by how much Magnode's 2018 spending on temporary labor "exceeded 2017 historical results" but did not come to an opinion on how much of this excess spending was particularly attributable to breaches by the Bidwells of their obligation to carry out the Indianapolis Facility Transfer according to commercially reasonable standards. *Id.* at PageID 6958–60.

Nowhere in Lappen and Carano's calculations regarding damages related to the Indianapolis transfer do they express "in terms of probability" that any specific breach by the Bidwells of their obligations under § 7.01(a) was a substantial factor causing the damages they calculated. *See Claris,* ¶ 42. The fact that Shape has failed to raise a genuine issue of material fact as to whether it sustained damages as a result of its claimed breaches related to the Indianapolis facility transfer[21] formulates an independent basis for granting summary judgment in favor of the Bidwells on this issue.

**§ 7.01(c) damages.** Shape has similarly failed to adequately substantiate its claimed damages under § 7.01(c). In its Response, Shape asserts that its claimed damages related to the Indianapolis facility transfer were caused by the Bidwells' mismanagement. Doc. 121,

---

[21] There is some indication in the record that Magnode's overall business did not, in fact, suffer significantly as a result of the conduct Shape alleges. The business's results for 2019 exceeded the target set in the APA. Doc. 109, PageID 12793.

PageID 14596. Further, Shape presses that it received updates from the Bidwells stating that the Indianapolis facility transfer was not facing significant problems. *Id.* (citing M. White 30(b)(6) Dep. Tr., Doc. 108, 130:14–18). Read liberally, this can be taken as an assertion that these claimed damages were caused by Magnode's purported breaches of both § 7.01(a) and § 7.01(c),[22] because Shape would have been able to address purported issues with the Indianapolis transfer had the Bidwells timely informed Shape of them.

Interpreting Shape's damages claims in this way, the claims fail with respect to § 7.01(c) for the same reason they fail with respect to § 7.01(a)—Shape's damages experts did not opine that the purported breach of § 7.01(c) was a substantial factor in contributing to the damages they calculated. The question is not close with respect to § 7.01(c). Lappen and Carano's Report does not mention any specific failure to notify under § 7.01(c), nor is there any basis to read between the lines of their Report to find an implied assertion that a failure to notify caused any of the specific damages they identify. Shape has failed to raise a genuine issue of fact as to whether it suffered any damages substantially caused by an alleged breach of § 7.01(c). This failure is an independent reason to grant summary judgment to the Bidwells on Shape's indemnification claim for breach of § 7.01(c).

### iv.    GAAP Accounting

Shape has also made an indemnification claim based on APA § 4.04(a). Under APA § 4.04(a), the Bidwells agreed to provide audited financial statements for the years 2014, 2015, and 2016, and unaudited financial statements for the period ending October 31, 2017, and that those financial statements were prepared, or would be prepared, "in accordance with the

---

[22] Shape asserted no separate damages for purported breaches of § 7.01(c).

Books and Records of Seller and in accordance with GAAP applied on a consistent basis throughout the period involved." APA § 4.04(a), Doc. 32-1, PageID 976.[23] Specifically, Shape argues that it identified "$631,524 in fixed assets that either did not exist or had dramatically overstated values." Doc. 121, PageID 14609. It seeks indemnification under APA § 9.02(a) for its damages from this purported misstatement.[24] Relevant to analysis of this indemnification claim, APA § 9.04(e) further provides: "Solely for purposes of calculating the amount of any Losses related to an inaccuracy in or breach of any representation or warranty set forth in ARTICLE IV or V of this Agreement and determining whether there is an inaccuracy in or a breach of such representation or warranty, any materiality limitations or

---

[23] The section reads in full:

> Copies of the audited financial statements consisting of the balance sheet of Seller as at December 31 in each of the years 2016, 2015, and 2014 and the related statements of income and retained earnings, shareholders' equity, and cash flow for the years then ended ("the Audited Financial Statements"), and unaudited financial statements consisting of the balance sheet of the Business as at October 31, 2017, and the related statements of income and retained earnings, shareholders' equity, and cash flow for the ten (10) month period then ended ("the Interim Financial Statements" and together with the Audited Financial Statements, the "Financial Statements") are attached to Section 4.04(a) of the Disclosure Schedules. The Financial Statements have been prepared, and the Interim Financial Reports will be prepared, in accordance with the Books and Records of Seller and in accordance with GAAP applied on a consistent basis throughout the period involved, subject, in the case of the Interim Financial Statements and the Interim Financial Reports (other than for the period ending December 31, 2017), to normal and recurring year-end adjustments and the absence of notes. The Financial Statements fairly present, and the Interim Reports will fairly present, in all material respects the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated, all in accordance with GAAP. The balance sheet of the Business as of December 31, 2016, is referred to herein as the "Balance Sheet" and the date thereof as the "Balance Sheet Date" and the balance sheet of the Business as of October 31, 2017, is referred to herein as the Interim Balance Sheet and the date thereof as the Interim Balance Sheet Date.

APA § 4.04(a), Doc. 32-1, PageID 976.

[24] Shape's Response does not specify under which indemnification provision it makes its GAAP claim. In its correspondence with the Bidwells regarding its Notice of Indemnification, however, Shape indicated that it brings this claim under § 9.02(a), which allows indemnification for damages from breaches of representations and warranties made in the APA. *See* Doc. 32-5, PageID 1268 ("As a result the Cap [on damages under § 9.02(a)] has no effect on claims made under Sections 9.02(b) and 9.02(c), which cover all of the Direct Claims—save for the newly discovered [GAAP accounting] breach of Section 4.04(a).").

qualifications (including the terms 'material' and 'Seller Material Adverse Effect') applicable to any such representation or warranty will be disregarded." Doc. 32-1, PageID 1013.

The Bidwells seek summary judgment on the accounting claim on the grounds that Shape has failed to provide evidence that the financial statements the Bidwells provided were not prepared in accordance with GAAP. Specifically, they argue that Shape needs expert testimony to establish that Magnode's financial statements were inconsistent with GAAP, and Shape has failed to provide it. Instead, Shape's experts expressly disclaimed any opinion on whether the Bidwells' financial statements complied with GAAP. Doc. 113, PageID 13913. Without any expert testimony on GAAP, the Bidwells argue Shape has failed to raise a genuine issue of material fact as to whether they violated APA § 4.04(a). *Id.* at PageID 13914.

Shape argues in response that its experts need not "perform an audit of [Magnode's] financials" and that the parties "provide conflicting accounts regarding the fixed assets at issue," making summary judgment inappropriate. Doc. 121, PageID 14610. Shape does not dispute that it needs expert testimony to substantiate its GAAP claim but argues that the expert testimony it offered was sufficient to do so. *Id.* at PageID 14609–10.

The dispute turns on what constitutes an expert opinion concerning whether Magnode's financial statements, as a whole, were prepared in accordance with GAAP. Shape's experts *did* opine on whether various aspects of Magnode's fixed-asset accounting were consistent with GAAP. They concluded that "[a]t least $631,524 of fixed asset values were included in both the Seller represented Financial Statements and Interim Financial Statements which were not reported in accordance with GAAP." Lappen & Carano Rep., Doc. 98-4, PageID 6971. Specifically, they found that four different aspects of Magnode's

38

fixed asset accounting were not consistent with GAAP: (1) Magnode reporting fixed asset values for assets that no longer existed, (2) Magnode capitalizing costs in a manner inconsistent with GAAP, (3) Magnode assessing certain assets to have unreasonable salvage values, and (4) Magnode assessing certain assets to have unreasonable useful lives. *Id.* at PageID 6971–77. They did not, however, offer an opinion on whether Magnode's financial statements as a whole were prepared in accordance with GAAP, which would be an audit opinion. Lappen Dep. Tr., Doc. 104, 287:13–15 ("I'm not offering opinion regarding the financial statements as a whole, which is what audit opinions are."); Carano Dep. Tr., Doc. 103, 111:16–19 ("I'm not offering an opinion on the financial statements as a whole that you referenced, whether those financial statements as a whole are in accordance with GAAP.").

The cases the Bidwells cite do not stand directly for the proposition that to prove that financial statements violated GAAP, a party needs to offer expert testimony in the form of an audit report. In fact, some of those cases acknowledge that experts may opine on whether certain accounting practices are consistent with GAAP; financial statements are not the only proper subjects of GAAP analysis. *See United States v. Turner*, No. CR05-355C, 2007 WL 1367597, at *2 (W.D. Wash. 2007) ("The Government acknowledges that if it wants to discuss *particular practices or accounting treatments* in the instant case in terms of GAAP, expert testimony is required.") (emphasis added).

The Court is reminded, however, that Magnode's financial statements *were* audited, after which process its auditors reached the conclusion that the financial statements, as a whole, were prepared in accordance with GAAP. D. Howell Dep. Tr., Doc. 92, 88:13–16 ("[T]hose statements were all audited by an outside firm and were according to GAAP as far as the outside accountants confirmed."). *See also* J. Carano Dep. Tr., Doc. 103, 145:12–24

("Q. You don't have any reason to doubt the representation from the auditors that the financial statements as a whole were prepared in accordance with GAAP, right? . . . [A]: I have not reviewed their work papers to conclude whether the basis of their opinion is correct or not, or would be to the same conclusion we would reach if we audited the financial statements.").[25]

The Court agrees with the Bidwells that Shape's expert testimony is not adequate to raise a genuine issue of material fact as to whether the Bidwells violated the guarantee that Magnode's financial statements, as a whole, fairly presented its financial picture. In its brief, Shape accuses the Bidwells of "cherry-pick[ing]" from its experts' testimony on GAAP. Doc. 121, PageID 14609. But the Court finds Shape's cherry-picking more troubling—asking its experts to opine on certain pre-identified alleged accounting discrepancies rather than asking them to review Magnode's financial statements as a whole and determine whether they were prepared in accordance with GAAP.

---

[25] The difference between the auditors' conclusion that the statements were GAAP-compliant and Lappen and Carano's conclusion that certain aspects of Magnode's fixed-asset accounting were not GAAP compliant could lie in materiality. When auditors assess a company's financial statements, they disregard discrepancies that fail to reach a certain threshold—discrepancies they consider immaterial. While the Bidwells fail to press the point, implicit in their argument is the contention that any discrepancies in Magnode's fixed-asset accounting may be immaterial to its overall financial reporting. *See* J. Carano Dep. Tr., Doc. 103, 146:7–21 (Q: . . . Sitting here today, do you have a basis to conclude that the financial statements -- the representation in the audit papers that they were prepared in accordance with GAAP is false? A: I have no basis to say whether it was correct or false. Q. Right. A. Other than the $631,000 that are included in those financial statements, that that -- those assets are not in accordance with GAAP. Q. But you haven't set a materiality threshold, right? A. It's not necessary.").

The Bidwells may not have pressed the point because on its face there appears to be a contractual problem with the materiality argument. APA § 9.04(e) provides that for purposes of determining whether there was a breach of any of the covenants in Article IV, "any materiality limitations or qualifications . . . applicable to any such representation or warranty will be disregarded." APA § 9.04(e), Doc. 32-1, PageID 1013. The Court concludes, however, that it would be inappropriate to read this clause to say that Shape can prove a breach of § 4.04(a) by showing *any* accounting discrepancy. The guarantee in § 4.04(a) was that Magnode's financial statements, as a whole, "fairly present, in all material respects the financial condition of the business" in accordance with GAAP. Even after reading out the materiality limitation as APA § 9.04(e) instructs, the guarantee still refers to the financial statements as a whole. To prove a violation, Shape needs to show that the financial statements, as a whole, misrepresented the financial condition of the business.

The burden lies with Shape to substantiate its GAAP indemnification claim, as it does for each indemnification claim. To meet that burden Shape must present evidence that raises a genuine issue of material fact as to whether Magnode's financial statements, *as a whole*, were not GAAP-compliant and thus misrepresented the financial condition of the business. Were the guarantee at issue related to Magnode's accounting practices *in general*, the evidence Shape has adduced may have been enough to survive summary judgment. But it is not; instead, the guarantee at issue relates to Magnode's financial statements as a whole. Shape has failed to adduce sufficient evidence on this point to raise a genuine issue of material fact as to the validity of its indemnification claim under APA § 4.04(a). The Bidwells are thus entitled to summary judgment on this claim.

### v.    Excluded Liabilities

Shape also seeks indemnification for Excluded Liabilities under APA § 9.02(c). Excluded Liabilities include: "any Liabilities or obligations arising out of or relating to Seller's ownership or operation of the Business and the Purchased Assets prior to the Closing Date, including Environmental Liabilities arising from or relating to facts, events or conditions first occurring or in existence prior to the Closing." Doc. 32-1, PageID 962. Environmental Liabilities include "any Losses arising from or relating to any violation of or Liability under any Environmental Law or Occupational Safety and Health Law or Workers' Compensation Law . . ." APA Article I, *id.* at PageID 949.[26] Shape identifies four categories of Excluded

---

[26] The section reads in full:

"Environmental Liability" means any Losses arising from or relating to any violation of or Liability under any Environmental Law or Occupational Safety and Health Law or Workers' Compensation Law including (a) any Environmental, health or safety matters or conditions (including on-site or off-site contamination and regulation of chemical substances or products), and (b) any responsibility for

Liabilities: storm drain repair, coolant discharge, asbestos remediation, and expenses related to a Magnode storage tank. *See* Lappen & Carano Report, Doc. 104-1, PageID 10224–27.[27] The Court addresses these expenses in turn.

### a.        Storm drain repair

Shape seeks indemnification for multiple storm-water-related expenses: more than $400,000 for facility-wide storm drain repair, $5,100 for "storm water pond engineering review," and $1,591 for rerouting coolant discharge that had been directed to a storm drain. *Id.* at PageID 10224, 10227.

Most significant, Shape seeks indemnification for $428,764 spent on storm drain repair and renovation post-closing.  *Id.* at 10226–27.[28] The Bidwells argue that the storm drain repair expense is not an Excluded Liability because it did not "aris[e] from or relat[e] to facts, events or conditions first occurring or in existence prior to the Closing." APA § 2.04(a), Doc. 32-1, PageID 962. They also argue that Shape cannot support its indemnification claim for storm drain repair without expert testimony that the storm drain expenses "arose from an Environmental Liability." Doc. 113-1, PageID 13915. Shape counters that it has adduced

---

response costs, natural resource damages, corrective action or actions to achieve compliance, including any cleanup, removal, containment or other remediation or response action to the extent required under applicable Environmental Law. The terms "removal", "remedial," and "response action" include the types of activities covered by the Federal Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., as amended, or any other Environmental Law.

APA Article I, Doc. 32-1, PageID 949.

[27] The Bidwells' Motion categorizes Shape's storm drain claim as an Excluded Liability (Doc. 113-1 at PageID 13915–16), while Lappen and Carano's Report categorizes it as a Cost Over Run. Doc. 104-1, PageID 10225–27. Because Shape does not contradict the Bidwells' assertion that Shape seeks indemnification for storm drain repair as an Excluded Liability, the Court primarily evaluates the claim under that rubric, then briefly addresses whether this expense qualifies as a Cost Over Run.

[28] Shape's Proposed Undisputed Facts provide a slightly different figure: $427,764 to repair storm drains. Doc. 121-1, PageID 14848.

evidence showing that storm-water issues existed prior to closing, and it does not need an expert to show that the Bidwells "left the Trenton facility in a condition that violated environmental regulations." Doc. 121, PageID 14607.

Resolution of this issue turns on whether the storm-water issues that Shape remedied were "in existence prior to the Closing," APA § 2.04(a), and were a "violation of or Liability under any Environmental Law . . ." APA Article I, Doc. 32-1, PageID 962, 949. Both must be true for Shape's storm drain repair expenses to be an Excluded Liability.

The storm-water issue is complicated by the fact that Shape incurred different expenses for different storm-water-related problems in Spring 2018 and Shape's Response confuses the different issues, as Shape points to evidence related to coolant discharge to substantiate its claim for indemnification for other storm-water-related expenses. Lappen and Carano's expert report makes clear that these are separate issues; "Coolant discharge rerouting" is in a separate section of the report, and only $1,591 in expenses is attributed to it. Doc. 104-1, PageID 10224. *See also* Shape Proposed Undisputed Facts ¶ 485, Doc. 121-1, PageID 14838. Further, a different contractor handled this issue and it involved rerouting effluent to a sanitary sewer, rather than renovating storm drains. *See* M. Westerbrook Dep. Tr., Doc. 112, 137:12–18. The Court thus considers these two issues separately. First, it considers Shape's indemnification claim for facility-wide storm drain repair. Next, in a separate sub-section, it considers whether Shape is entitled to indemnification for coolant discharge rerouting.

As to repair and renovation of storm drains,[29] Shape's claim fails because it does not show the expenses it incurred were to redress problems that existed prior to closing or were

---

[29] The Court considers Shape's indemnification claim of $5,100 for "Storm water pond engineering review," *see* Lappen & Carano Report, Doc. 98-4 at PageID 6968 *and* Shape Proposed Undisputed Facts ¶ 552, Doc. 121-

necessary to bring Magnode into compliance with environmental regulations. The evidence adduced indicates this work was done in connection with the new hardscaping done at the facility discussed in Section IV.B.ii, *supra*. *See* Doc. 121-1, PageID 14661 ("During construction, Shape discovered that the hardscaping project could not continue until corroded and defective storm water drains were repaired."). The evidence adduced—apart from Shape's bare assertions—does not support Shape's contention that this work was a "Liabilit[y] or obligation[] arising out of [the Bidwells'] operation of the business pre-Closing." APA § 2.04(a), Doc. 32-1, PageID 962. Rather, the evidence indicates this work was part of Shape's extensive post-closing voluntary renovation of Magnode's Trenton campus.[30]

In Shape's Response, it fails altogether to point to evidence indicating these expenses were to remedy an environmental issue existing pre-closing, as it primarily cites evidence related to the unrelated coolant discharge issue. *See* Doc. 121, PageID 14606–07. (It also cites to a document showing that "Shape discovered that equipment moved by the Bidwells from Indianapolis to Trenton was leaking coolant into a storm drain," but this is also unrelated to the storm drain repair for which Shape seeks indemnification. *Id.* at PageID 14607.)

In addition to failing to establish that the storm drain repair was an obligation arising from pre-closing conduct, Shape failed to point to evidence raising a genuine issue as to whether the storm drain repairs were an Environmental Liability—*i.e.*, they were done to

---

[1] at PageID 14850, in this category. Shape has not identified any reason that this storm-water expense should be analyzed differently than the other expenses it incurred renovating storm drains. Notably, this work was completed alongside Shape's general storm drain improvements, by the same contractor. Doc. 121-1, PageID 14832.

[30] The fact that this work was done in connection with new hardscaping likely explains why Shape initially claimed it as a Cost Over Run rather than an Excluded Liability. *See* Shape Proposed Undisputed Facts, Doc. 121-1, PageID 14848.

bring the facility into compliance with environmental regulations—and would be indemnifiable on that basis.[31] Because Shape failed to raise a genuine issue of fact as to whether the expenses it incurred for storm drain repair meet the narrow definition of Excluded Liabilities in § 2.04(a), the Bidwells are entitled to summary judgment on this indemnification claim.

The Court observes that the evidence adduced indicates Shape *did face* at least one discrete storm-water issue: a clogged line between buildings five and six. *See* M. Westerbrook Dep. Tr., Doc. 112, 131:11–17. Shape has not, however, pointed the Court to any evidence indicating that the storm drain repairs it made were related to this issue, or identified separate damages caused by it. More importantly, Shape has not pointed the Court to any evidence that Magnode was out of compliance with environmental laws or regulations *pre-closing* as a result of this issue. *Id.* at 150:2–4 ("[Q:] Was Magnode issued any kind of like citation or violation related to that clogged line? A[:] No, thank goodness."). In order to be an Excluded Liability, an expense incurred must be to remedy an issue arising from conduct pre-Closing. APA § 2.04, Doc. 32-1, PageID 962. Shape has offered no evidence this clogged line issue was in existence pre-closing or the result of the Bidwells' conduct pre-closing. Having reviewed the record in this case carefully, the Court concludes that the existence of this issue does not mean Shape has raised a genuine issue as to the validity of its indemnification claim for storm drain repairs.

_____

[31] Nothing in Shape's Proposed Undisputed Facts gives the Court pause regarding this conclusion. As to some of these facts, Shape fails to make clear the connection between the assertion and the storm drain repair at issue. Doc. 121-1, PageID 14832. As to others, Shape points to testimony that fails to raise a genuine issue as to whether Shape's storm drain improvements—which were done in connection with new hardscaping—were necessary to bring Magnode's Trenton facility into compliance with environmental laws and regulations or were otherwise a liability or obligation resulting from pre-Closing conduct. Mr. Westerbrook's equivocal testimony that "[his] understanding was that the drainage on the site was not sufficient before," Westerbrook Dep. Tr., Doc. 112, 194:4–5, does not raise a genuine issue on this point.

The Court thus agrees with the Bidwells that Shape failed to present evidence raising a genuine issue of fact as to whether the storm drain repairs Shape made were "Liabilities or obligations" arising from the Bidwells' pre-Closing conduct. As to the more specific argument that these expenses are Environmental Liabilities, the Court finds that Shape has failed to raise a genuine issue as to whether Magnode's storm-water issues existed pre-closing and amounted to non-compliance with environmental law. Accordingly, it need not address the Bidwells' second argument that Shape needs expert testimony to substantiate its storm drain repair Environmental Liability claim.

The Court notes that this issue has been confused by the fact that in its indemnification notice, Shape sought indemnification for storm drain repairs as a "Cost Over Run." Doc. 32-3, PageID 1257. Shape's damages report also identifies storm drain expenses as a Cost Over Run rather than an Excluded Liability. Doc. 104-1, PageID 10225. Shape does not, however, contest the Bidwells' representation in their motion that Shape seeks indemnification for these expenses as Excluded Liabilities under § 2.04(a), and does not separately argue in its Response that the Bidwells' Motion should be denied because drain repair was indemnifiable as a Cost Over Run. Doc. 121, PageID 14606–07. Mindful that to the extent the Bidwells' Motion is unresponded to, the Court must "intelligently and carefully review" it while "refrain[ing] from actively pursuing advocacy or inventing the *riposte* for a silent party," *Guarino v. Brookfield Tp. Trustees*, 980 F.2d 399, 405 (6th Cir. 1992), the Court will not address in depth the argument that storm drain repair is indemnifiable as a Cost Over Run.

With respect to this argument, the Court notes only that similar analysis applies to a claim for indemnification for drain repair as for the related hardscaping—which, the record reflects, were completed together. Doc. 121-1, PageID 14661–62. Shape would only be

entitled to indemnification for storm drain repair as a "Cost Over Run" to the extent it was related to the "2018 Expansion Project" as defined in the contract. Just like for the hardscaping claim, the evidence adduced indicates expenses for storm drain repair were *not* for the 2018 Expansion Project but were instead part of facility-wide improvements going beyond the scope of that Project. *See* Lappen & Carano Report, Doc. 104-1, PageID 10226 (calculating expenses related to storm drain repair throughout Trenton site).

### b.      Coolant discharge

Shape has also claimed indemnification for coolant discharge rerouting in the amount of $1,591, which is the issue Shape focused on in its briefing regarding storm drain repairs. Doc. 121, PageID 14606. Counsel for the Bidwells represented on the record during the November 22, 2024, hearing that they paid this $1,591 expense and Shape thus sustained no damages as a result of this issue. That assertion was uncontroverted. On that basis, the Court grants summary judgment to the Bidwells on Shape's claim for indemnification of $1,591 for coolant discharge rerouting.

### c.      Asbestos remediation

Shape has also sought indemnification of $9,140 for asbestos abatement carried out post-closing, which it claims is an Excluded Liability. Doc. 104-1, PageID 10224. The Bidwells seek summary judgment on this claim on the basis that Shape "voluntarily incurred" the expenses in question so that Magnode's Trenton campus would meet Shape's standards. Doc. 113-1, PageID 13916. They argue that Shape has failed to raise a genuine issue of material fact as to whether Magnode was not in compliance with environmental regulations regarding asbestos pre-Closing. *Id.* Shape counters that the Bidwells withheld from Shape information about asbestos during the due diligence phase. Doc. 121, PageID 14607–08.

As is a theme in this case, Shape fails to run its claims through the contract. That is to say, rather than argue that it is entitled to indemnification under the terms of the APA, it points to a separate supposed misdeed by the Bidwells as support for its indemnification claim. This effort fails here as it does elsewhere. To be an Environmental Liability as defined in the APA, an expense must "aris[e] from or relat[e] to any violation of or Liability under any Environmental Law." Doc. 32-1, PageID 949. Shape's burden here is simple: it must show that its asbestos remediation was necessary to bring Magnode's Trenton facility into compliance with environmental law.

Shape fails to meet this burden as it points the Court to no evidence that Shape's asbestos monitoring and removal was necessary to comply with any identified environmental law. Rather, the evidence adduced indicates that Shape's asbestos removal was voluntary, to make sure the Trenton facility complied with Shape's standards—not for compliance with legal standards. *See* M. White Dep. Tr., Doc. 108, 144:10–11 ("[W]e don't operate facilities with asbestos, period."). Shape's arguments regarding pre-closing representations by the Bidwells fail to raise a genuine issue of material fact as to whether asbestos removal was an Excluded Liability under the APA.[32] Accordingly, the Bidwells are entitled to summary judgment on Shape's indemnification claim related to asbestos.

### d. Underground storage tank inspection

Shape also seeks indemnification of $3,233 for investigation of an underground tank on Magnode's Trenton campus. Doc. 104-1, PageID 10224. The Bidwells seek summary

---

[32] Additionally, the main representation Shape points to—an email from Mark Butterfield to Mike Westerbrook saying Magnode "had tests completed in the past with no signs of asbestos"—was made in April 2018, after closing. Doc. 121, PageID 14608; Doc. 108-9, PageID 12407. That representation, then, does not support Shape's argument that the Bidwells withheld information about asbestos *during* diligence.

judgment on this claim because Shape "offers no evidence that any law compelled this investigation or that the mere presence of the tank is an Environmental Liability." Doc. 113, PageID 13916. The Court reaches the same conclusion regarding this claim as Shape's claim for indemnification for asbestos. Rather than arguing that any expenses it incurred related to this underground storage tank were required to bring the Trenton facility into compliance with environmental law, Shape instead argues it is entitled to indemnification because the Bidwells "represented that there were no underground storage tanks onsite during diligence." Doc. 121, PageID 14608. This is irrelevant to compliance with environmental law. In fact, it is undisputed that the tank, at the time of closing, was in compliance with environmental law. Shape Response to Proposed Undisputed Facts ¶ 210, Doc. 121-1, PageID 14736–37. The Bidwells are entitled to summary judgment on this issue.

### C. Shape's Fraud in the Inducement Counterclaim

Finally, the Court addresses Shape's counterclaim for fraud in the inducement. Doc. 33, PageID 1295–96. In this counterclaim, Shape asserts that the Bidwells "made misrepresentations and concealed material facts related to the costs for the 2018 Expansion Project, the Indianapolis Facility Transfer, the Trenton facility's environmental liabilities, and their compliance with GAAP." *Id.* at PageID 1295. It argues these misrepresentations "were made with the intent to induce Shape into entering into the APA without full and accurate information" and it "relied on the Bidwells' misrepresentations to its detriment when it executed the APA." *Id.* at PageID 1296. The Bidwells move for summary judgment on this counterclaim on the grounds that it "arises from the same facts and circumstances as [Shape's] breach of contract claim." Doc. 113, PageID 13917. They argue that Shape cannot bring a breach of contract action alongside a fraud action.

49

"The existence of a contract action generally excludes the opportunity to present the same case as a tort claim." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137, 153 (9th Dist. 1996). *See also Burrows v. Fuyao Glass America Inc.*, 2017 WL 6262189, at *4 (S.D. Ohio Dec. 8, 2017) ("Ohio law prohibits a claim in tort predicated upon the same actions that create a breach of contract.") (citing *Eggert Agency, Inc. v. NA Mgmt. Corp.*, 2008 WL 3474148, at *6–7 (S.D. Ohio Aug. 12, 2008)). However, a party can, in theory, bring a claim for fraud in the inducement (or fraudulent inducement—the terms are used interchangeably) alongside a breach of contract claim, so long as the fraud in the inducement claim pleads a breach of a duty separate from any duty owed under the contract. *Kettering Adventist Healthcare v. Jade Designs, LLC*, 677 F.Supp.3d 735, 749 (S.D. Ohio June 13, 2023) ("Fraud in the inducement can generally be maintained simultaneously with a breach of contract claim because the duty not to breach a contract is separate and independent from the duty not to deceive a party entering into an agreement or contract.") (citations and internal quotation marks omitted).

In order to prevail on a claim for fraud in the inducement, then, Shape would need to prove a breach by the Bidwells of a duty they owed to Shape independent of any duty owed under the contract. Additionally, Shape would need to substantiate damages "unique and separate from any injury resulting from a breach of contract." *Medical Billing, Inc. v. Medical Management Sciences, Inc.*, 212 F.3d 332, 338 (6th Cir. 2000). Shape fails on both scores.

First, Shape has not raised a genuine issue of material fact as to whether the Bidwells breached a duty separate from any contractual duty owed under the APA. They allege that the Bidwells "failed to provide Shape with an honest representation of their progress managing the Indianapolis Facility Transfer; the full scope of the 2018 Expansion Project; the

existence of Excluded Liabilities pre-Closing; and the inclusion of overly inflated or non-existent fixed assets in Magnode's financial statements." Doc. 121, PageID 14614–15. These alleged misrepresentations are not "collateral to the contract," *see Thornton v. Cangialosi*, 2010 WL 2162905, at *3 (S.D. Ohio May 26, 2010), as they would need to be to support a claim for fraudulent inducement.[33]

The example of a viable fraudulent inducement claim provided in *Wall v. Planet Ford, Inc.* is instructive as to what misrepresentations qualify as collateral to a contract. 2005-Ohio-1207, ¶ 35 (2d Dist.) The court explained:

> An example of a proper claim of fraudulent inducement . . . would be a situation in which a pest controller signs a homeowner to a contract for extensive termite-control measures, following an inspection of the premises, upon a misrepresentation that the house is infected with termites when, in fact, there is no termite infestation. The alleged oral misrepresentation is not at variance with the terms of the contract. The parties are in complete agreement as to the terms of the contract to which they agreed—certain services are to be performed in exchange for the payment of money. But the contract, the terms of which are not in dispute, was induced by the seller's fraudulent representation that the house was infested with termites, when it wasn't.

*Id.*

Here, by contrast, the parties' dispute is about who is to bear certain costs under the terms of the contract. The alleged misrepresentations *are* at variance with the terms of the contract; it is the proper interpretation of those contract terms that it is at the core of this dispute, not the circumstances under which the contract was signed.

This conclusion is supported by *Thornton v. Cangialosi*, which stands for the proposition that where a fraudulent inducement claim and breach of contract claim are "factually intertwined and cannot be separated," the alleged misrepresentations are not collateral to the

---

[33] One indication that these alleged misrepresentations are not collateral to the APA is that they incorporate defined terms under the APA.

contract and the fraudulent inducement claim cannot survive. 2010 WL 2162905, *4 (S.D. Ohio May 26, 2010). That case involved a guarantee made as part of an all-stock sale of a business that the buyer—Nick Cangialosi—would purchase the sellers'—the Thorntons'—stock upon certain triggering events. *Id.* at *1. When one of those events occurred, and Mr. Cangialosi failed to make good on the stock-purchase guarantee, the Thorntons sued on the contract and for fraudulent inducement, claiming that Mr. Cangialosi misrepresented his financial condition in order to induce them to make the deal. *Id.* The court concluded that the Thorntons' fraudulent inducement claim could not be brought alongside the breach of contract claim because "[t]he representations that allegedly induced Plaintiffs to enter into the [sale agreements] are the same allegedly unfulfilled promises that give rise to the breach of contract claim." *Id.* at *5. Because the fraudulent inducement claim and breach of contract claim were "factually intertwined and cannot be separated," the court dismissed the fraudulent inducement claim. *Id.*

Here, Shape's fraudulent inducement claim is "factually intertwined and cannot be separated" from its claim for indemnification under the APA. *Id.* Necessarily, then, Shape has failed to adequately allege a misrepresentation "collateral to the contract," *id.* at *3, and so would be unable to prevail at trial on this claim. Thus, the Bidwells are entitled to summary judgment.

The Bidwells are also entitled to summary judgment on this claim on the separate basis that Shape has failed to provide evidence of any damages it suffered apart from those it claims under the APA. Ohio law requires that "fraud damages be limited to the injury actually arising from the fraud. The tort injury must be unique and separate from any injury resulting from a breach of contract." *Medical Billing, Inc.*, 212 F.3d at 338. Shape has failed to provide evidence

52

of any damages sustained as a result of the alleged fraud as apart from alleged contract breaches. *See* Lappen & Carano Report, Doc. 104-1, PageID 10208 (only identifying damages "associated with Shape's claims for which Shape is seeking indemnification"). Because Shape failed to "establish damages additional to those it claimed as a result of contract breach," it "did not ultimately differentiate its fraud claim from its claim for breach of contract." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137, 153 (9th Dist. 1996). The Bidwells are also entitled to summary judgment on that basis. *See id.* (awarding directed verdict to defendant both on breach of contract claims and fraudulent inducement claims).

## V.    CONCLUSION

Shape has represented to the Court at the parties' November 22, 2024 hearing that once the parties' contractual disputes are resolved, Shape would "pay whatever is left," fulfilling its obligations under the APA. That time has now come. The Court has resolved the parties' contractual disputes; Shape is obligated to pay the full amount promised under the APA.

As set out above, the Court concludes Shape has failed to raise a genuine issue of material fact as to any of its indemnification claims. Accordingly, the Bidwells' Motion for Summary Judgment as to the Bidwells' breach of contract claim is **GRANTED**. For the same reason, the Bidwells' Motion for Summary Judgment as to Shape's breach of contract action is **GRANTED**. Further, for the reasons stated above, the Bidwells' Motion for Summary Judgment as to Shape's counterclaim for fraudulent inducement is **GRANTED**.

**IT IS SO ORDERED.**

December 31, 2024

Jeffery P. Hopkins
United States District Judge

53